UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


SECURITIES AND EXCHANGE          )
COMMISSION,                      )
                                 )
        Plaintiff,               )          CIVIL ACTION NO.
                                 )
VS.                              )          3:08-CV-1013-G
                                 )
GREGORY CARL GUNN,               )          **ECF**
                                 )
        Defendant.               )


**MEMORANDUM OPINION AND ORDER**


        Before the court is the motion of the plaintiff Securities and Exchange

Commission ("the Commission" or "the SEC") for entry of judgment on the verdict

(docket entry 113). For the reasons discussed below, the motion is granted. The

defendant Gregory Carl Gunn ("Gunn" or "the defendant") will be required to make

disgorgement in the amount of $139,782.97, a permanent injunction will issue

against him, and he will be required to pay a civil penalty in the amount of

$50,000.00.

# I. BACKGROUND

This is a civil action to enforce the federal securities laws. This action arises out of Gunn's April 2006 purchase of securities in a company called Aviall, Inc. ("Aviall"), which was acquired by the Boeing Company ("Boeing") in September 2006. The Commission initiated this action on the basis of a misappropriation theory of insider trading. *See* Joint Pretrial Order (docket entry 96) at 1.[1] Specifically, the Commission alleged that in early 2006, an Aviall employee named Robert Tedder ("Tedder") received several pieces of material, nonpublic information that Aviall was likely to be acquired by Boeing. See *id.* at 6. Tedder misappropriated this insider information by "tipping" -- *i.e.*, furnishing this material, nonpublic information to--persons outside of Aviall. *Id.* at 6-7. One of the persons whom Tedder tipped was Phillip Gunn ("Phillip"), the defendant's brother, who had befriended Tedder during the course of his work as one of Aviall's commercial real-estate agents. *Id.* Tedder tipped Phillip in April 2006 by telling him that he believed Boeing would announce its intention to acquire Aviall some time in May 2006. *Id.* at 1-2, 7. Phillip, in turn, tipped the defendant by furnishing him with this material, nonpublic information. *Id.* at 2, 7. Beginning on April 17, 2006, Gunn started

---

[1]      "It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *McGehee v. Certainteed Corporation*, 101 F.3d 1078, 1080 (5th Cir. 1996) (citation and internal quotation marks omitted).

buying Aviall stock and Aviall call options.[2]  *Id.* at 2, 5, 7.  Gunn invested a total of

$110,487.16 in Aviall securities, purchasing $75,512.97 of Aviall common stock and

$34,974.19 of Aviall call options.  *Id.* at 5.  As Tedder had predicted it would, Boeing

publicly announced its intention to acquire Aviall on May 1, 2006.  *See* id. at 4-5.

That same day, Gunn sold all of his Aviall securities.  The sale netted him a profit of

$108,587.87.  *Id.* at 5.

The Commission brought this action against Gunn, Tedder, Phillip, and two

other defendants.  *See* Second Amended Complaint (docket entry 9) at 1.  Four of the

defendants settled with the Commission.  Gunn proceeded to trial, and the case was

tried to a jury.  At trial, the Commission contended that Gunn had engaged in an

insider-trading scheme in violation of section 10(b) of the Securities Exchange Act of

1934 ("the Exchange Act"), *see* 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder, *see* 17 C.F.R. § 240.10b-5.  *See* Verdict (docket entry 111) at 13-17.  The

jury found in favor of the Commission.  *Id.* at 22.  The Commission now seeks entry

of judgment on the verdict.  The Commission seeks an order:  (1) requiring Gunn to

disgorge the profits he illegally realized from his insider trading and prejudgment

interest on the disgorgement; (2) permanently enjoining Gunn from any future

violations of Section 10(b) of the Exchange Act and Rule 10b-5; and (3) directing

---

[2]        A "call option" is a security that gives the holder of the option the right
(but does not impose an obligation) to purchase a certain amount of common stock
at a specified price.  *See* Verdict (docket entry 111) at 14.

Gunn to pay a civil monetary penalty of three times the amount of the profits he illegally realized from his insider trading as authorized by Section 21A of the Exchange Act, *see* 15 U.S.C. § 78u-1(a)(2). *See* Brief in Support of Motion for Entry of Judgment on the Verdict ("Brief in Support") (docket entry 114) at 1-2.

## II. ANALYSIS

### A. Disgorgement and Prejudgment Interest

The court concludes that Gunn should be required to disgorge the profits he realized on his insider-trading scheme. Section 27 of the Exchange Act, *see* 15 U.S.C. § 78aa, "'confer[s] general equity powers upon the district courts to fashion remedies for securities laws violations.'" *In re Bayou Group, LLC*, 564 F.3d 541, 548 (2d Cir. 2009) (quoting *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972)); see also *Securities and Exchange Commission v. Texas Gulf Sulphur Company*, 446 F.2d 1301, 1307-08 (2d Cir.), *cert. denied*, 404 U.S. 1005 (1971). "Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy," *Manor Nursing Centers*, 458 F.2d at 1103, including an order requiring the defendant "to disgorge the profits that he obtained by fraud," *Securities and Exchange Commission v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978). See also *Securities and Exchange Commission v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997).

- 4 -

"Disgorgement wrests ill-gotten gains from the hands of a wrongdoer.  It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs."  *Securities and Exchange Commission v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) (internal citations omitted).  "'[T]he court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.'"  *Securities and Exchange Commission v. Seghers*, 298 F. App'x 319, 336 (5th Cir. 2008) (quoting *Blatt*, 583 F.2d at 1335).

Here, the parties have stipulated that Gunn earned profits in the amount of $108,587.87 from the May 1, 2006 sale of his Aviall securities.  *See* Joint Pretrial Order at 5.  Gunn does not dispute that he must disgorge the profits he earned on his sale of Aviall securities.  *See* Brief in Response to Plaintiff's Motion for Entry of Judgment on the Verdict ("Brief in Response") (docket entry 115) at 10 ("Gunn respectfully requests that the Court deny the Commission's request for a permanent injunction and the assessment of any civil penalty.").  Therefore, the court will enter judgment requiring Gunn to disgorge his $108,587.87 in profits.

The Court also concludes that the Commission is entitled to an award of prejudgment interest.  "Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations. . . .  Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."  *Securities and Exchange Commission v.*

*Sargent*, 329 F.3d 34, 40-41 (1st Cir. 2003) (citations and internal quotation marks

omitted).  Whether to award prejudgment interest is a matter of the district court's

discretion.  *Securities and Exchange Commission v. United Energy Partners, Inc.*, 88 F.

App'x 744, 747 (5th Cir.) (per curiam), *cert. denied sub nom.  Quinn v. Securities and

Exchange Commission*, 543 U.S. 1034 (2004).

 In this case, Gunn does not dispute that he must disgorge prejudgment

interest; nor does he take issue with the Commission's proposed method of

calculating the prejudgment interest.[3]  *See* Brief in Response at 10.  As of August 26,

2010, prejudgment interest has accrued in the amount of $31,195.10.[4]  See generally

*First Jersey Securities*, 101 F.3d at 1477 (affirming the district court's decision to order

---

[3] The Commission has calculated the amount of prejudgment interest it
seeks using the Internal Revenue Service ("IRS")'s rate of interest on tax
underpayments and refunds.  *See* Brief in Support at 5 n.2.  *See generally* 26 U.S.C.
§ 6621(a)(2) (defining the IRS underpayment rate as the Federal short-term interest
rate plus three percentage points).  The IRS underpayment rate "reflects what it
would have cost to borrow the money from the government and therefore reasonably
approximates one of the benefits the defendant derived from its fraud.  Accordingly,
courts have approved the use of the IRS underpayment rate in connection with
disgorgement."  *First Jersey Securities*, 101 F.3d at 1476 (citations omitted); *see also*
Securities and Exchange Commission Rules of Practice, 60 Fed. Reg. 32738, 32740
(June 23, 1995) (explaining that, in administrative proceedings before the
Commission, "[t]he rate of interest is set at the IRS underpayment rate and
compounded quarterly unless the Commission specifies a lower rate").

[4] At the time the Commission filed its brief, the amount of prejudgment
interest that had accrued was $26,248.70.  *See* Brief in Support of Motion for Entry
of Judgment on the Verdict, Exhibit A, U.S. Securities and Exchange Commission
Division of Enforcement Prejudgment Interest Report.  Since then, an additional
$4,946.40 has accrued as prejudgment interest.  *See* Court's Calculation of
Prejudgment Interest (attached to this order as Exhibit A).

"that prejudgment interest be paid for the entire period from the time of defendants' unlawful gains to the entry of judgment").  Therefore, the court will enter judgment requiring Gunn to disgorge a total of $139,782.97.

## B.  Permanent Injunction

The court concludes that Gunn should be permanently enjoined from future violations of Section 10(b) of the Exchange Act and Rule 10b-5.  The Commission is authorized to seek a permanent injunction whenever it appears that a person "is engaged or is about to engage in acts or practices constituting a violation" of the federal securities laws.  *See* 15 U.S.C. § 78u(d)(1).  "[W]hether to grant or deny injunctive relief is addressed to the sound discretion of the district court," *Securities and Exchange Commission v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980), although the court is required to grant injunctive relief "upon a proper showing" by the Commission, *see* 15 U.S.C. § 78u(d)(1); see also *Caterinicchia*, 613 F.2d at 105 ("Statutory injunctive relief . . . must be granted whenever either of the statutory conditions, *i.e.*, 'engaged in or about to engage in' proscribed activity, [is] satisfied.").  Here, the Commission does not allege that Gunn is presently engaged in acts or practices constituting a violation of the securities laws  *See* Brief in Support at 2-4.

"To satisfy the 'proper showing' requirement in a case where current violations are not alleged, the SEC must establish that there is a reasonable likelihood that the defendant, if not enjoined, will engage in future violations of the securities laws."

*Securities and Exchange Commission v. Mize*, 615 F.2d 1046, 1051 (5th Cir.), *cert. denied*, 449 U.S. 901 (1980). "To prove this likelihood, 'the Commission needs to go beyond the mere fact of past violations.'" *Id.* at 1055 (quoting *Blatt*, 583 F.2d at 1334) (brackets omitted). "To say that past misconduct gives rise to an inference of future misconduct is not enough. What is required is a specific enumeration of the factors . . . that merit permanent exclusion." *Steadman v. Securities and Exchange Commission*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981); see also *Securities and Exchange Commission v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009) ("Without more, a defendant's past violation of the securities laws . . . is insufficient to support permanent injunctive relief.").

"The critical question in issuing the injunction . . . is whether [the] defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Blatt*, 583 F.2d at 1334. Specifically, the Commission must demonstrate that the following factors, taken together, suggest that future violations are probable: "[1] the egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of *scienter* involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful nature of his conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations." *Blatt,* 583 F.2d at 1334 n.29; see also *Gann*, 563 F.3d at 940. "[I]t is not a single factor, but rather the sum

of the circumstances surrounding the defendant and his past conduct that governs whether to grant or deny injunctive relief." *Securities and Exchange Commission v. Zale Corporation*, 650 F.2d 718, 720 (5th Cir.), *cert. denied sub nom. Underwood v. Securities and Exchange Commission*, 454 U.S. 1124 (1981); see also *Securities and Exchange Commission v. First City Financial Corporation, Limited*, 890 F.2d 1215, 1228 (D.C. Cir. 1989) ("No single factor is determinative; instead, the district court should determine the propensity for future violations based on the totality of the circumstances."). In this case, the court concludes that, on balance, the relevant factors favor the issuance of an injunction. The court will discuss each factor in turn.

## (1) *Egregiousness*

The court concludes that Gunn's conduct in this case constitutes an egregious violation of the federal securities laws. The Fifth Circuit has not announced a standard for determining what kind of misconduct constitutes an egregious violations of the securities laws. Other federal courts have relied on the presence of one or more of the following aggravating factors when concluding that a violation of the federal securities laws is egregious: the fact that a defendant's violation was "flagrant and deliberate" as opposed to "merely technical in nature," see, *e.g.*, *First City Financial*, 890 F.2d at 1228;[5] the fact that the defendant's violation was also a breach of a

---

[5] Compare also *Securities and Exchange Commission v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004) ("It is . . . intentional, knowing conduct, as opposed to more minor, technical violations, for which injunctions are reserved."), and *Manor*

(continued...)

fiduciary duty, see, *e.g.*, *Ginsburg*, 362 F.3d at 1304;[6] the fact that the defendant's

violation caused others to suffer significant financial losses, see, *e.g.*, *Commodity Futures*

*Trading Commission v. Investors Freedom Club, Inc.*, 2005 WL 940897, at *2 (M.D. Fla.

Apr. 4, 2005);[7] or the fact that the defendant's violation arose out of a complex or

elaborate scheme to defraud, see, *e.g.*, *Securities and Exchange Commission v. Friendly*

*Power Company LLC*, 49 F. Supp. 2d 1363, 1372 (S.D. Fla. 1999).[8]

---

[5](...continued)
*Nursing Centers*, 458 F.2d at 1101 (approving of the district court's reliance on the fact the defendants' violations were "willful, blatant, and often completely outrageous") (internal quotation marks omitted), with *Securities and Exchange Commission v. Steadman*, 967 F.2d 636, 638 (D.C. Cir. 1992) (vacating an injunction issued by the district court where the defendants' only violation of the securities laws was their failure "to include a general footnote in their financial statements disclosing their contingent liabilities"), and *Blatt*, 583 F.2d at 1335 (vacating an injunction issued by the district court against a defendant whose violation was "relatively minor").

[6]    See also *Securities and Exchange Commission v. Lorin*, 877 F. Supp. 192, 201 (S.D.N.Y. 1995) (enjoining a former stock broker for "breaching his fiduciary duties to his customers"), *aff'd in relevant part*, 76 F.3d 458 (2d Cir. 1996).

[7]    See also *Securities and Exchange Commission v. Lauer*, 2008 WL 4372896, at *25 (S. D. Fla. Sept. 24, 2008) ("Lauer's conduct was egregious, pervasive, premeditated and resulted in the loss of hundreds of millions of dollars in investors' funds."); *Lorin*, 877 F. Supp. at 201 (enjoining a defendant whose conduct "caused his customers' accounts . . . to have a negative net worth of $1.8 million").

[8]    Compare also *Lauer*, 2008 WL 4372896, at *25 ("Lauer violated the antifraud provisions of the federal securities laws by conducting an elaborate scheme to defraud investors . . . ."), and *Securities and Exchange Commission v. Sayegh*, 906 F. Supp. 939, 948 (S.D.N.Y. 1995) (enjoining a defendant who had helped orchestrate a market maker's scheme to artificially support the price of a particular stock), *aff'd sub nom. Securities and Exchange Commission v. v. Militano*, 101 F.3d 685 (2d Cir. 1996),

(continued...)

By contrast, when a federal court concludes that a defendant's violation of the federal securities laws was not egregious, one of two mitigating factors is almost always present: either the defendant did not personally profit from his violation, or the defendant's personal profits from the violation were *de minimis*.  See, *e.g.*, *Sargent*, 329 F.3d at 39 (concluding that the violation committed by a defendant who provided material nonpublic information to others but did not act on that information "was not an egregious one" because "he neither traded on the [nonpublic] information himself nor derived any direct personal profit").[9]

---

(...continued)
with *Sargent*, 329 F.3d at 40 (affirming the district court's decision not to enjoin a defendant whose "violation was isolated and unsophisticated").

[9]    See also *Securities and Exchange Commission v. Shanahan*, 2010 WL 173819, at *15 (D. Minn. Jan. 13, 2010) (concluding that the defendants' conduct was not egregious where they had earned no personal profit by violating the securities laws); *Securities and Exchange Commission v. Snyder*, 2006 WL 6508273, at *3 (S.D. Tex. Aug. 22, 2006) (concluding that the conduct of a defendant who sold stock based on inside information was not egregious because he did not sell all of the shares that he owned and the profits he earned on the shares he did sell were offset by losses he suffered on the shares he did not sell); *Securities and Exchange Commission v. Happ*, 295 F. Supp. 2d 189, 196 (D. Mass. 2003) (Keeton, J.) (finding that a defendant's insider-trading activity was not egregious where it merely resulted in the defendant "avoiding a relatively modest loss in comparison with [his] net worth"), *aff'd*, 392 F.3d 12 (1st Cir. 2004).  But see *Ginsburg*, 362 F.3d at 1304 (reversing the district court's decision not to enjoin a defendant who did not personally profit from his misappropriation of insider information where both the defendant's brother and father had profited by trading on that information); *Securities and Exchange Commission v. Gallagher*, 1989 WL 95252, at *10 (E.D. Pa. Aug. 16, 1989) (rejecting the defendant's argument that the fact that "he derived no profit or benefit from his actions" was a reason not to issue an injunction).

In this case, at least one of the aggravating factors typically relied on by federal courts indicates that Gunn's conduct was egregious. Insider trading is a flagrant, deliberate, and serious violation of the federal securities laws; in no sense is it merely technical. *See* Selective Disclosure and Insider Trading, Exchange Act Release No. 43,154, [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 86,319, at 83,692, 2000 WL 1201556, at *20 (Aug. 15, 2000) ("[T]he prohibitions against insider trading in our securities laws play an essential role in maintaining the fairness, health, and integrity of our markets. We have long recognized that the fundamental unfairness of insider trading harms not only individual investors but also the very foundations of our markets . . . ."). In addition, there is no mitigating factor that dampens the egregiousness of Gunn's conduct. To the contrary -- Gunn appears to have made every effort to maximize the profit he earned from trading on the material nonpublic information he received. Gunn's insider-trading activity netted him a profit of more than $100,000, which he was able to earn only by liquidating his other stock holdings and investing as much money into Aviall securities as he could raise. To earn his profit of $108,587.87, Gunn invested $110,487.16 between April 17, 2006, and May 1, 2006. In other words, he earned a return on his money of more than 98 percent in just two weeks' time without suffering any offsetting losses. Therefore, the court finds that Gunn's conduct was egregious and that this factor weighs in favor of the issuance of an injunction.

(2) *Isolated or Recurrent Nature of the Infraction*

The court concludes that Gunn's violations of the federal securities laws was isolated, not recurrent. Courts employ two primary measures of whether a violation of the securities law was isolated or recurrent. The first factor is simply the length of time for which the violation or violations persisted. Compare, *e.g.*, *Securities and Exchange Commission v. Opulentica*, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (finding that a violation was not "a single, isolated incident" where the violation arose out of "a continuing course of wrongful conduct of more than eighteen months"),[10] with *Snyder*, 2006 WL 6508273, at *1, *4 (characterizing as isolated the conduct of a defendant who committed four separate violations of the federal securities laws over a period of a few months).[11] The second factor is whether the defendant is a first-time or repeat offender. Compare *Sargent*, 329 F.3d at 39 (noting that the defendant's conduct was "a first-time violation" of the securities laws and affirming the denial of

---

[10] See also *Securities and Exchange Commission v. Bonastia*, 614 F.2d 908, 913 (3d Cir. 1980) (finding that "the repetitiveness of the violations" committed by a defendant whose fraudulent scheme lasted for more than five years "weighs heavily in favor of the imposition of an injunction"); *Sayegh*, 906 F. Supp. at 948 (finding that violations were not isolated where they went on for more than seventeen months).

[11] See also *Securities and Exchange Commission v. Yun*, 148 F. Supp. 2d 1287, 1294 (M.D. Fla. 2001) (concluding that a violation was isolated where "numerous trades on [inside] information all occurred within a three-day time period"), *vacated on other grounds*, 327 F.3d 1263 (11th Cir. 2003); *Securities and Exchange Commission v. Ingoldsby*, 1990 WL 120731, at *2 (D. Mass. 1990) (declining to issue an injunction where the defendant's "infraction of the securities law was an isolated event, and the SEC has presented no evidence of either prior or subsequent violations by the defendant.").

an injunction), with *First Jersey Securities*, 101 F.3d at 1477 (documenting the defendants' numerous previous violations of state and federal securities laws and affirming the issuance of an injunction).

In this case, all of Gunn's insider trading took place during the two weeks between April 17 and May 1, 2006. This is also the first time that Gunn has been found liable for violating the securities laws. Therefore, the court finds that Gunn's conduct was isolated and that this factor weighs against the issuance of an injunction.

(3) *Scienter*

The court concludes that Gunn acted with a high degree of *scienter*. *Scienter* is a necessary element of a substantive violation of Section 10(b) of the Exchange Act and Rule 10b-5. *Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 695 (1980). To establish *scienter*, the Commission must prove that the defendant acted intentionally, knowingly, or in a manner that was severely reckless. See, *e.g.*, *Seghers*, 298 F. App'x at 333 (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). In this case, by returning a verdict that Gunn violated Section 10(b) and Rule 10b-5, the jury necessarily found that Gunn "knew, should have known, or was severely reckless in not knowing" that he was trading on material nonpublic information. *See* Verdict at 20. "When issues common to both legal and equitable claims are tried together, the findings of the jury on the legal issues are binding on the trier of the equitable claims." *Hodges v. City of Houston*, 71 F.3d 877 (tbl.), 1995 WL

726463, at *2 (5th Cir. Nov. 15, 1995) (citing *Beacon Theatres v. Westover*, 359 U.S. 500 (1959)). The court is thus obligated to find that Gunn acted with a high degree of *scienter* and that this factor weighs in favor of the issuance of an injunction.[12]

(4) and (5) *Recognition of Past Wrong and Assurances Against Future Wrongs*

The court concludes that Gunn fails to recognize the wrongful nature of his conduct and has provided inadequate, insincere assurances against future violations of the securities laws.[13] The court's assessment of these two factors is guided by a pair of countervailing considerations. On the one hand, many courts have concluded that a defendant's continued insistence that he did not violate the securities laws is evidence

---

[12] It appears to the court that this factor will weigh in favor of the issuance of an injunction in all cases in which a jury has found that the defendant violated Section 10(b) and Rule 10b-5. See *Ginsburg*, 362 F.3d at 1305 (concluding that the degree-of-*scienter* factor weighs in favor of an injunction where a jury has found that the defendant acted with the *scienter* required for a § 10(b) violation); *Securities and Exchange Commission v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980) (concluding that "[t]he above-listed factors militate strongly in favor of granting an injunction" where the defendant "had, at the least, acted recklessly in violating" the securities laws). The court would need to undertake its own analysis of the defendant's level of *scienter* only if the jury's finding that the defendant violated the securities laws in question did not necessarily entail a finding that the defendant acted with *scienter*. See, *e.g.*, *Steadman*, 603 F.2d at 1140-41 (applying *Blatt's* six-factor test for the issuance of an injunction and noting that "while *scienter* is not required to make out violations of" sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933, "the respondent's state of mind is highly relevant in determining the remedy to impose" and cautioning that "[i]t would be a gross abuse of discretion" to issue an injunction "on the basis of isolated *negligent* violations") (emphasis added).

[13] Because the considerations that are relevant to these two factors are so similar, the court will consider them jointly. Accord, *e.g.*, *Securities and Exchange Commission v. Johnson*, 2006 WL 2053379, at *6 (S.D.N.Y. July 24, 2006)

that he does not recognize the wrongful nature of his conduct and undermines any assurances he has offered against future wrongs. See, *e.g.*, *Securities and Exchange Commission v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) (per curiam) (concluding that the defendants' "persistent refusals to admit any wrongdoing made it rather dubious that they are likely to avoid such violations of the securities laws in the future in the absence of an injunction") (citation, internal quotation marks, and brackets omitted).[14] On the other hand, many courts have stressed that a defendant "should not be prejudiced for presenting a vigorous defense and requiring the SEC to meet its proper evidentiary burden both at trial and at the injunctive relief stage of the judicial proceedings." See, *e.g.*, *Ingoldshy*, 1990 WL 120731, at *3.[15] The combined teaching

---

[14]     See also *Ginsburg*, 362 F.3d at 1305 ("[P]romises to toe the line . . . are of very little worth at all where, as here, the defendant denies having done anything at all improper to begin with. Promising to stop doing wrong while denying any wrongdoing is the wrong way to establish that wrongdoing will not reoccur."); *Manor Nursing Centers*, 458 F.2d at 1101 ("[T]he fact that these appellants continued to maintain that their past conduct was blameless was a factor appropriately considered by the district court in assessing the need for a permanent injunction."); *Securities and Exchange Commission v. Seghers*, 2006 WL 2661138, at *5 (N.D. Tex. Sept. 14, 2006) (Kinkeade, J.) (enjoining a defendant who "continue[d] to maintain that he committed no securities fraud"), *rev'd in part on other grounds*, 298 F. App'x 319 (5th Cir. 2008); *Gallagher*, 1989 WL 95252, at *9 (concluding that a defendant who "consistently has contended in his SEC testimony, affidavit, and submissions to this Court that his actions were not illegal" cannot be said to have "recognized the wrongful nature of his conduct").

[15]     See also *First City Financial*, 890 F.2d at 1229 (noting that securities defendants "are not to be punished because they vigorously contest the government's accusations"); *Snyder*, 2006 WL 6508273, at *5 (criticizing the Commission for seeking from the defendant an admission of wrongdoing that "would eliminate all of

(continued...)

of these two considerations is this: the mere fact that a defendant denies the Commission's allegations, proceeds to trial, and does not admit fault after losing at trial does not, standing alone, suggest that the defendant is likely to commit another violation of the securities laws. What matters is the manner in which the defendant conducts himself during the course of presenting the vigorous defense to which he is entitled.

Specifically, there are three indicators, the presence of which convey a lack of contrition and foreshadow a propensity for future violations. First, it is unlikely that a defendant recognizes the wrongful nature of his conduct if his continued protestations of innocence are unreasonable or lack a plausible basis in the evidence. See, *e.g.*, *Lauer*, 2008 WL 4372896, at *25 (concluding that assurances against future violations are not credible where the defendant "maintains a position of innocence in the face of overwhelming evidence to the contrary").[16] Second, if a defendant is

_____

(...continued)
Defendant's appellate rights"); *Yun*, 148 F. Supp. 2d at 1294 ("[W]here litigants do not publicly acknowledge the wrongfulness of their conduct due to a decision to contest SEC enforcement, such actions should not prejudice those litigants since a full and vigorous defense is a right under our system of justice.) (citation and internal quotation marks omitted).

[16]     Compare also *Securities and Exchange Commission v. Savino*, 2006 WL 375074, at *17 (S.D.N.Y. Feb. 16, 2006) (enjoining a defendant who had been "unwilling to admit that he engaged in wrongdoing . . . despite overwhelming evidence to the contrary"), *aff'd in relevant part*, 208 F. App'x 18 (2d Cir. 2006), with *Snyder*, 2006 WL 6508273, at *5 (concluding that a defendant's "continuing claim of innocence" offered minimal support for the SEC's request for injunction relief where

(continued...)

dishonest, exhibits a lack of candor, or offers inconsistent testimony during the course

of the action, an injunction is more likely to be warranted.  See, *e.g.*, *Securities and

Exchange Commission v. Holschuh*, 694 F.2d 130, 145 (7th Cir. 1982) (concluding that

the "lack of candor" exhibited by a defendant who had taken "inconsistent positions

at various stages of the proceedings" suggested a reasonable likelihood of future

violations).[17]  Third, a defendant who has failed to demonstrate "an appreciation of

the critical importance of the securities laws and regulations, as well as the seriousness

---

(...continued)
expert testimony at trial showed that "accountants may disagree as to whether or not
Defendant's actions violated the securities laws"), and *Happ*, 295 F. Supp. 2d at 197
(concluding that a defendant was unlikely to engage in insider trading in the future
where he had "advanced credible explanations for his conduct").

[17]     Compare also *First Jersey Securities*, 101 F.3d at 1478 (affirming the
district court's decision to issue an injunction where the defendant's testimony at trial
was "belligerently evasive") (citation, internal quotation marks, and brackets
omitted), *Manor Nursing Centers*, 458 F.2d at 1101 ("In view of the inconsistencies in
each appellant's testimony . . ., the district court was justified in doubting the veracity
of appellants' assurances."), *Securities and Exchange Commission v. Conaway*, 697 F.
Supp. 2d 733, 773 (E.D. Mich. 2010) ("[T]he right to contest the SEC's claims in a
court of law . . .  does not license false testimony under oath in asserting a defense."),
*Savino*, 2006 WL 375074, at *17 (enjoining a defendant who had been "untruthful
during his deposition and in his testimony during trial"), and *Commodity Futures
Trading Commission v. Wilshire Investment Management Corporation*, 407 F. Supp. 2d
1304, 1314 (S.D. Fla. 2005) ("[T]he lack of candor which [the defendants]
demonstrated at trial belies any intent of making good faith efforts to comply with
restrictions in the future."), *aff'd in relevant part*, 531 F.3d 1339 (11th Cir. 2008),
with *Ingoldsby*, 1990 WL 120731, at *3 ("I find that the defendant's level of
truthfulness, candor and cooperation in his initial SEC investigatory interview, during
his trial testimony, and at the evidentiary relief hearing does not predict any
reasonable likelihood of his future violation of securities laws.").

of the charges and verdict against him," cannot be said to have offered sincere

assurances against future violations. See *Snyder*, 2006 WL 6508273, at *5.[18]

Each of the three indicators of a lack of contrition and a propensity for future

violations is present in this case. At his September 2009 deposition, which took place

less than six weeks before trial, Gunn was asked, "[S]hould you have done things

differently in April of 2006?" and he responded, "No, not based upon the facts as I

had them at that time." *See* Brief in Response at 5. Gunn continued to deny any

wrongdoing at trial. At trial, Gunn claimed that he made the decision to begin

purchasing Aviall securities in April 2006 because one of Aviall's quarterly earnings

reports was delayed and because the contents of an 8-K filing hinted at a possible

merger. But the evidence unequivocally showed that the earnings report was not yet

delayed at the time Gunn began purchasing Aviall securities, and Gunn was forced to

admit that he had not actually read the 8-K at the time he decided to invest in Aviall.

Gunn sticks to his story in his post-verdict briefing. See *id.* at 4 (noting "Gunn's

sincere belief that the information he received was not material, nonpublic

---

[18]     Compare also *Yun*, 148 F. Supp. 2d at 1294 (declining to impose injunctive relief against two defendants who had "expressed their regret at involvement in the insider trading scheme" and attested that they "fully appreciate[d] the importance of the securities laws"), with *Gallagher*, 1989 WL 95252, at *9 (concluding that a defendant whose testimony leaves the impression that he "still believes his actions did not violate the securities laws, and that he believes he would be guilty of only 'very poor judgment' if he were to repeat these actions in the future" cannot be said to have offered sincere, credible assurances against future violations of the securities laws).

information"). The court finds Gunn's denial of any wrongdoing to be wholly implausible. The court concludes, based on its observation of Gunn's testimony and the evidence presented at trial, that the only plausible explanation for Gunn's April 2006 trading activity is that he received material, nonpublic information about Aviall. The court also concludes that Gunn's continuing denial of this fact evinces an inability to admit to, and take responsibility for, his wrongdoing.

Gunn has also exhibited a lack of candor and honesty over the course of this proceeding. For example, in his September 2009 deposition, Gunn testified to the existence of a friendship between Phillip, his brother, and Tedder, the source of the material nonpublic information about Aviall. At trial, Gunn testified differently, denying that Phillip and Tedder were friends and characterizing their relationship as one of business associates. The court views this inconsistent testimony as a transparent and calculated attempt to defeat the Commission's proof that Tedder intended to receive a benefit from his disclosure of the material nonpublic information. Gunn also testified at trial that he did not remember whether his brother had tipped him about buying Aviall call options. He did so even though he had testified at his September 2009 deposition that he specifically recalled his brother advising him to purchase options. In short, Gunn has demonstrated a willingness to say anything that he believes will help him avoid liability for his actions. The court concludes that these inconsistencies in Gunn's testimony undercut the veracity and

reliability of the few assurances he has made that he will refrain from violating the federal securities laws in the future.

Gunn has also failed to demonstrate an appreciation of the seriousness of the charges against him and the importance of the federal securities laws. At trial, Gunn testified that he had never read his employer's policy on insider trading even though he was bound by that policy. The court declines to credit Gunn's assurances that he will not violate the securities laws again in the future when, by his own admission, Gunn has previously failed to take steps he was contractually obligated to take to avoid such violations. Further, Gunn's testimony at his September 2009 deposition that he would "do things differently" in the future simply because he "just [doesn't] want to go through this again" conveys a total lack of appreciation of the critical importance of the federal securities laws and regulations. As a result, the court finds that Gunn does not recognize the wrongful nature of his conduct and has provided insincere assurances against future violations and that these two factors both weigh in favor of the issuance of an injunction.

(6) *Opportunity for Future Violations*

The court concludes that there is a high likelihood that Gunn's occupation will present with him with the opportunity to commit future violations of the securities laws. Gunn is a licensed securities professional who deals in mutual funds and insurance products. He holds two federal securities licenses and one state securities

license.  It is well settled that a defendant who works as a securities professional is a defendant who practices an occupation that is likely to present him with the opportunity to commit future violations of the securities laws.  See, *e.g.*, *Thornton v. Securities and Exchange Commission*, 199 F.3d 440 (tbl.), 1999 WL 1068296, at *3 (5th Cir. Oct. 22, 1999) (per curiam) ("As long as he has a license to work as a registered representative, he will have opportunities to act in a supervisory capacity and otherwise to compromise the interest of clients.").[19]  A defendant's occupation must have no connection at all to the securities field for this factor to weigh against the issuance of an injunction.  See, *e.g.*, *Sargent*, 329 F.3d at 39-40 (affirming the district court's decision not to enjoin a dentist or the president of a web-casting company).[20]

---

[19]     See also *First Jersey Securities*, 101 F.3d at 1477 (affirming the issuance of an injunction against a defendant who "remained an active participant in the securities markets"); *Seghers*, 2006 WL 2661138, at *5 (imposing an injunction on a defendant who testified at trial that he "exclusively devoted himself to investing, largely on behalf of others"); *Johnson*, 2006 WL 2053379, at *7 (finding that the defendant's occupation as a hedge fund manager created a high likelihood that future violations would occur); *Savino*, 2006 WL 375074, at *17(finding that a defendant's "current occupation as a licensed securities professional trading bonds for a broker-dealer" put him "in a position to engage in further fraudulent conduct"); *Lorin*, 877 F. Supp. at 201 (issuing an injunction based in part on a finding that the fact that both defendants "still trade securities . . . presents an easy opportunity for future wrongdoing"); *Securities and Exchange Commission v. Rubin*, 1993 WL 405428, at *5 (S.D.N.Y. Oct. 8, 1993) (Mukasey, J.) (issuing an injunction against a defendant who was still working as a securities broker).

[20]     See also *Snyder*, 2006 WL 6508273, at *5 (declining to enjoin an certified public accountant who provided accounting services only to individuals and private companies, not public companies); *Yun*, 148 F. Supp. 2d at 1294 (declining to enjoin a realtor and the wife of a retired corporate executive); *Happ*, 295 F. Supp. 2d

(continued...)

The court is not persuaded by Gunn's contention that this factor does not support the issuance of an injunction because "Gunn did not receive the information regarding Aviall's potential merger as a result of his work in the securities industry," Brief in Response at 6. This factor entails an inquiry that is prospective, not retrospective. That inquiry focuses on the potential for securities-laws violations inherent in the defendant's occupation, not on the particulars of the defendant's past misconduct. For example, in *Gann*, the Fifth Circuit affirmed the district court's decision to impose an injunction on a defendant who had violated Section 10(b) of the Exchange Act and Rule 10b-5 by engaging in market-timing trades of mutual funds. *See* 565 F.3d at 934. The Fifth Circuit rejected the defendant's argument that an injunction was unnecessary because he no longer traded in mutual funds on the ground that "[t]he question is whether his job *provides opportunities* for future infractions. [The defendant] is still a stockbroker, so whether or not he trades mutual funds, his job certainly permits him the opportunity to do so." *Id.* at 940 (emphasis in original).[21]

---

[20](...continued)
at 197 (declining to enjoin a defendant who had retired).

[21]    See also *Sargent*, 329 F.3d at 39 (noting that this factor weighs in favor of an injunction where the defendant's occupation "will likely expose him to 'many temptations in the future'") (quoting *Securities and Exchange Commission v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974)); *Johnson*, 2006 WL 2053379, at *7 (finding that a defendant's occupation as a hedge-fund manager presented opportunities for future violations even though the violation for which he had been found liable arose out of
(continued...)

The Fifth Circuit's reasoning in *Gann* applies with equal force to this case. Even if Gunn is correct that his occupation will not provide him with the opportunity to violate the securities laws in the exact same manner that he did here, his job nonetheless will provide him with opportunities to engage in other kinds securities-related misconduct. As *Gann* illustrates, it is not unheard of for a seller of mutual-funds to run afoul of the securities laws. Therefore, the court finds that the likelihood Gunn's occupation will present opportunities for future violations is high and that this factor weighs in favor of the issuance of an injunction.[22]

---

[21](...continued)
his work as a securities analyst).

[22]    Gunn also argues that this factor does not support the issuance of an injunction because he is likely to be subject to statutory disqualification and have his securities licenses withdrawn or revoked as result of the jury verdict against him "[e]ven if no injunction is imposed." *See* Brief in Response at 6. However, if the court were to decline to issue an injunction, Gunn would be subject to statutory disqualification only if he were found to have engaged in a willful violation of the Exchange Act. *See* 15 U.S.C. §§ 78c(a)(39)(F) & § 78o(b)(4)(D). That prospect, as Gunn acknowledges, is speculative at best. *See* Brief in Response at 6 (contending only that "Gunn *may* be subject to disqualification") (emphasis added). There is nothing in the record that would prevent Gunn from arguing that the jury found he had committed a violation of the securities laws that was reckless, not willful. In addition, the Commission has averred that it will not initiate an administrative proceeding to disqualify Gunn if the court determines an injunction is not warranted. *See* Brief in Support at 7. Perhaps most to the point, the Fifth Circuit has held that "a change in occupation, without a detailed showing of how that change necessarily renders it unreasonable to expect future violations, is legally insufficient to defeat injunctive relief." *Zale*, 650 F.2d at 721. If an actual change in occupation does not render it unreasonable to expect future violations, then *a fortiori* a possible or speculative change cannot do so, either.

The court concludes that these factors, taken together, demonstrate that there is a reasonable likelihood that Gunn, if not enjoined, will engage in future violations of the securities laws. The egregiousness of Gunn's misconduct, the high level of *scienter* with which he acted, his failure to recognize the wrongfulness of his action, the insincerity of his assurances against future violations, and the fact that his present occupation will present him with numerous opportunities to violate the securities laws in the future all weigh in favor of the issuance of an injunction. The fact that this violation was Gunn's first and that his conduct was isolated, not recurrent, is not enough to show that an injunction is unnecessary. Where, as here a defendant is "guilty of only one 'reprehensible fraud,'" an injunction is appropriate if "continuing investment opportunities strengthen[] the inference from his past conduct that he [is] likely to commit future violations." See *Ginsburg*, 362 F.3d at 1305 (quoting *Blatt*, 583 F.2d at 1335). The court's decision to enjoin Gunn is heavily influenced by its observation of Gunn's demeanor and testimony at trial and his demonstrated willingness to dissemble. The court finds, based on the totality of the circumstances and the evidence presented at trial, that Gunn is reasonably likely to commit further violations of the securities laws in the future. Therefore, Gunn will be permanently enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5.[23]

---

[23] The Commission seeks an injunction not only against Gunn but also

(continued...)

## C.  Civil Monetary Penalty

The court concludes that a civil monetary penalty of $50,000 is appropriate. Section 21(A) of the Exchange Act authorizes the court to assess a civil monetary penalty on a person who has engaged in insider trading.  *See* 15 U.S.C. § 78u-1(a)(2). The amount of the penalty "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of" the insider-trading activity.  *Id.*  Both the decision whether to assess a civil monetary penalty and the determination of what amount of a penalty is appropriate are entrusted to the district court's discretion.  See *Securities and Exchange Commission v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004) (citing *Sargent*, 329 F.3d at 38).

Congress has articulated a strong public policy in favor of the assessment of civil penalties in insider-trading cases.  See *Sargent*, 329 F.3d at 41 n.2 (quoting H.R. Rep. No. 98-355, at 7-8 (1983), *reprinted in* 1984 U.S.C.C.A.N. 2274, 2280-81). These penalties serve a dual purpose:  "to 'enhance deterrence against insider trading, and where deterrence fails, to augment the current methods of detection and punishment of this behavior.'"  *Happ*, 392 F.3d at 32 (quoting H.R. Rep. No. 100-

---

[23](...continued)
against Gunn's "agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice" of the court's judgment. against people acting in concert with Gunn.  *See* Proposed Final Judgment at 4. However, the court concludes that, in the absence of circumstances more extraordinary than those presented here, an injunction whose terms bind persons not party to this action would be overly broad.  Accord *Johnson*, 2006 WL 2053379, at *7 n.4.

910, at 7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043, 6044). "Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if he is not detected, and requires only a return of ill-gotten gains if he is caught." See *Opulentica*, 479 F. Supp. 2d at 331-32 (imposing civil penalties under 15 U.S.C. §§ 77t(d) & 78u(d)) (citation, internal quotation marks, and brackets omitted).

The Fifth Circuit has not promulgated a list of factors that district courts should consider when determining what kind of civil penalty to assess under 15 U.S.C. § 78u-1(a)(2). See generally *Yun*, 148 F. Supp. 2d at 1295 ("Judicial consensus has yet to develop as to which particular 'facts and circumstances' courts should focus on in order to promote the twin aims of deterrence and punishment."). Most courts have relied on either the following set of factors or something very similar: "(1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry." *Happ*, 392 F.3d at 32 (citing *Sargent*, 329 F.3d at 42); see also *Yun*, 148 F. Supp. 2d at 1295 (identifying as the relevant factors "the egregiousness of the violations, the isolated or repeated nature of the violations, the degree of *scienter* involved, the deterrent effect given the defendant's financial worth, and other penalties arising from

the conduct") (citations omitted). In any case, it is clear that there is substantial overlap between the factors that are relevant to the assessment of civil penalties under 15 U.S.C. § 78u-1(a)(2) and the factors that are relevant to the imposition of an injunction under 15 U.S.C. § 78u(d)(1). See *Snyder*, 2006 WL 6508273, at *11.

In this case, the court has already made findings regarding three of the six factors that are relevant to the court's calculation of the appropriate civil monetary penalty. Gunn's violation of the securities laws was egregious, and he is employed in the securities industry. The court finds that these factors weigh in favor of assessing a civil monetary penalty.[24] However, the fact that Gunn's violations were isolated in

---

[24] The question of whether Gunn's conduct was sufficiently egregious to justify the issuance of an injunction was black-or-white. In the civil-penalties context, however, the question of egregiousness turns on shades of grey. See *Rubin*, 1993 WL 405428, at *6 ("Even considerations of general deterrence do not mandate the maximum penalty in every case. If they did, there would be no reason for Congress to have granted courts discretion to impose a lesser penalty."). In other words, the court's finding that Gunn's conduct was egregious supports the assessment of some kind of penalty. But it does not, without further analysis, shed light on the question of what amount of a penalty is appropriate. As to that question, the court notes that whereas the presence of only one aggravating factor, see *supra* notes 5-8 and accompanying text, is sufficient to justify the issuance of an injunction, multiple aggravating factors have been present in most cases in which the maximum civil penalty has been found to be appropriate. See *Securities and Exchange Commission v. Ginsburg*, 2002 WL 1835810, at *5 (S.D. Fla. July 8, 2002) ("All of the cases in which the maximum civil penalty is awarded involve extremely egregious conduct . . . ."), *vacated*, 242 F. Supp. 2d 1310 (S.D. Fla. 2002), *reinstated*, 362 F.3d 1292 (11th Cir. 2004); see also *Yun*, 148 F. Supp. 2d at 1295 (citing and describing cases); *Securities and Exchange Commission v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001) (imposing the maximum civil penalty on an insider-trading defendant who had orchestrated an elaborate fraudulent scheme), *aff'd*, 278 F.3d 656 (7th Cir. 2002). Therefore, the court concludes that while the egregiousness of Gunn's conduct weighs

(continued...)

nature weighs against assessing a substantial penalty.  The court will discuss the three remaining factors in turn.

(1) *Gunn's Financial Worth*

The court concludes that Gunn's relatively modest financial worth weighs against the assessment of a substantial civil penalty.  The defendant's net worth and corresponding ability to pay has proven to be one of the most important factors that district courts consider when determining how much of a civil penalty to assess in an insider-trading case.  See, *e.g.*, *Securities and Exchange Commission v. Pardue*, 367 F. Supp. 2d 773, 777 (E.D. Pa. 2005) (rejecting the Commission's argument that a defendant's "impecuniousness should have no effect on the Court's determination" of what civil penalty to assess on the grounds that ignoring a defendant's present financial condition would entail "doing considerable misjustice").[25]  In this case,

_____

(...continued)
in favor of the assessment of some kind of civil penalty, it does not weigh in favor of the assessment of the maximum civil penalty sought by the Commission.

[25]     Compare also *Securities and Exchange Commission v. Svoboda*, 409 F. Supp. 2d 331, 347-49 (S.D.N.Y. 2006) (denying the Commission's request for a maximum penalty and imposing penalties of less than one time the amount of profits the defendants earned from their insider trading, despite the fact that they had "perpetrated a fraud involving repeated securities law violations, considerable, profits, and a high degree of scienter" on the ground that a maximum penalty "would be inappropriate given each defendant's financial situation"), and *Rubin*, 1993 WL 405428, at *7 (assessing a $1,000 penalty against a defendant who had been ordered to disgorge about $6,300 on the grounds that the defendant was impecunious), with *Happ*, 295 F. Supp. 2d at 200 (concluding that a defendant's net worth of approximately $2.5 million "supports the imposition of a moderate civil penalty" and
(continued...)

Gunn's net worth is approximately $47,000.[26]  Given that the court has already

ordered that Gunn be liable for disgorgement of $139,782.97 ($108,587.87 of ill-

gotten profits plus $31,195.10 in prejudgment interest), "any civil penalty imposed

will have a significant impact on [his] resources," see *Yun*, 148 F. Supp. 2d at 1297.

Therefore, the court finds that Gunn's relatively low net worth weighs against the

assessment of a substantial civil penalty.

---

(...continued)
imposing a $35,000 penalty equal in amount to the loss avoided by the defendant as
a result of his insider trading), *Ginsburg*, 2002 WL 1835810, at *5 (relying on a
defendant's "substantial net worth" to justify the assessment of a penalty of
approximately 1.5 times the amount of profits the defendant realized from his insider
trading), *Yun*, 148 F. Supp. 2d at 1297 (assessing a penalty of $100,000 on a high
net-worth defendant who participated in, but did not personally profit from, an
insider-trading scheme that generated $269,000 in ill-gotten gains), *Lipson*, 129 F.
Supp. 2d at 1159 (assessing the maximum penalty on a defendant whose net worth
was more than 50 times the amount of the penalty), and *Securities and Exchange
Commission v. Ferrero*, 1993 WL 625964, at *19 (S.D. Ind. Nov. 15, 1993) (assessing
the maximum civil penalty on a defendant who testified that an amount equal to 60
percent of the penalty imposed was "a very small part of his total net worth"), *aff'd
sub nom. Securities and Exchange Commission v. Maio*, 51 F.3d 623 (7th Cir. 1995).

[26]      The Statement of Financial Condition submitted by Gunn lists a
negative net worth of ($214,542.64).  *See* United States Securities and Exchange
Commission Statement of Financial Condition of Gregory Carl Gunn as of 12/1/09 at
3, *attached to* Brief in Response as Exhibit C.  This figure is inaccurate for two reasons.
First, it incorporates the anticipated amount of the court's order of disgorgement plus
prejudgment interest.  Second, it factors in more than $127,000 in legal fees that
Gunn incurred in defending against this action.  These fees are not properly in
included in Gunn's liabilities for the purpose of determining what civil penalty is
appropriate.  See *Sargent*, 329 F.3d at 42 n.6 (rejecting the defendant's arguments
that his substantial legal expenses should be viewed "as an additional mitigating
factor" on the ground that "as a matter of public policy, legal costs borne by a
defendant should not be used to offset any penalty that would otherwise apply.").

## (2) *Whether Gunn Concealed His Trading*

The court concludes that Gunn did not conceal his insider-trading activity. Gunn used his own accounts to buy and sell the securities at issue, he did not trade in anyone else's name, and he did not attempt to cover up his trading after the fact. See, *e.g.*, *Sargent*, 329 F.3d at 42 (affirming the district court's decision not to assess civil penalties against an insider-trading defendant "who made no efforts to conceal his isolated transaction, which involved trading in the same stock during a short period of time").[27] The Commission argues that Gunn's "attempt to create the false impression at trial that he was not involved in any of the purchase decisions . . . should be considered an attempt to conceal his trading activities." Brief in Support at 6. However, the court does not agree that Gunn attempted to create such an impression. Gunn admitted at trial that, in April 2006, he directed his broker to begin selling securities out of his account and using the money to purchase Aviall securities. Therefore, the court finds that Gunn did not conceal his insider trading

---

[27]     Compare also *Ginsburg*, 2002 WL 1835810, at *5 (declining to impose a civil penalty where there was no evidence that the defendants "proceeded in a plan to conceal, deceive, or otherwise manipulate their communications or trades, through dummy accounts, covert phone calls, or otherwise"), with *Lipson*, 129 F. Supp. 2d at 1159 (imposing the maximum penalty on a defendant who "not only engaged in insider trading [but] he also engaged in a complex multifaceted scheme involving lawyers, accountants, and family members to cover up his illegal trading"), and *Securities and Exchange Commission v. Falbo*, 14 F. Supp. 2d 508, 528 (S.D.N.Y. 1998) (identifying the defendant's "attempt[s] to conceal his trades by trading through others' accounts and in his daughter's name" as a factor that supported the imposition of a substantial civil penalty).

activity and that this factor weighs against the assessment of a substantial civil penalty.

### (3)  *Other Penalties Arising as the Result of Gunn's Conduct*

The court concludes that other penalties are likely to arise as the result of Gunn's conduct.  Other penalties that arise as a result of the defendant's conduct weigh most heavily against the imposition of a civil penalty in cases in which those other penalties have already been imposed.  See, *e.g.*, *Sargent*, 329 F.3d at 42 (affirming the district court's decision not to assess civil penalties against a defendant who "was criminally convicted for his actions" on the ground that "the sanction imposed in the criminal case -- a year's probation and a $5,000 fine -- also tempers the need for an additional monetary penalty").[28]

In this case, it is likely that Gunn will suffer additional penalties in a subsequent administrative proceeding as a result of his insider trading.[29]  However,

_____

[28]  See also *Securities and Exchange Commission v. Shah*, 1993 WL 288285, at *6 and n.5 (S.D.NY. July 28, 1993) (declining to assess any civil penalty against a defendant who had already been subjected to a battery of criminal and regulatory penalties); *Rubin*, 1993 WL 405428, at *1, *6-*7 (imposing a penalty of only $5,000 on a defendant who had earned profits of almost $10,000, despite the fact that the defendant was a securities broker who had committed repeated insider-trading violations, where the defendant had been enjoined and suffered other financial penalties as a result of the litigation).

[29]  Because a permanent injunction will issue against Gunn as a result of the court's order, Gunn will be subject to being statutorily disqualified from working as a securities professional.  *See* 15 U.S.C. §§ 78c(a)(39)(F) & 78o(b)(4)(C) (subjecting a to statutory disqualification a person who has been enjoined from

(continued...)

those penalties have not yet been imposed and thus remain somewhat speculative. As between actual penalties that have already been assessed and potential penalties that might later be assessed, the former do not count as heavily in the court's analysis, but they do count for something. So too does the fact that statutory disqualification would make it more difficult for Gunn to earn a livelihood. Accord *Snyder*, 2006 WL 6508273, at *8, *11. Therefore, the court finds that Gunn probably will be subject to other penalties as a result of his conduct and that this factor weighs slightly against the assessment of a substantial civil penalty.

### (4) *Conclusion*

Although the Commission seeks the maximum civil monetary penalty, *see* Brief in Support at 8, the court concludes that the maximum penalty is inappropriate in this case. Only two of the six relevant factors -- the egregiousness of Gunn's conduct and the fact that he works as a securities professional -- weigh in favor of the assessment a substantial penalty, and Gunn's conduct is not so egregious as to warrant the assessment of the maximum penalty. Accord *Happ*, 295 F. Supp. 2d at 200 (characterizing the factors as "decidedly mixed" where only two of the six factors favored the assessment of a substantial penalty and concluding that a penalty "equal

---

[29](...continued)
engaging in any conduct or practice in connection with the purchase or sale of any security). And the Commission has stated its intention to initiate an administrative proceeding to suspend or disbar Gunn if an injunction is issued against him. *See* Brief in Support at 7.

to one time the loss avoided" was the best way to "effectuate the Congressional intent . . . to effect punishment on those who violate securities laws").  However, the court also concludes that a penalty of some kind is warranted.  Accord *Securities and Exchange Commission v. Brethen*, 1992 WL 420867, at *25 (S.D. Ohio Oct. 15, 1992) (concluding that "if § 21A is to have any deterrent effect, a civil penalty must be imposed under the facts found in this case" even though the court had found that the violations committed by the defendant, who was not a securities professional, were isolated and not egregious).  The court's decision to impose a fine on the lower end of the statutory range is heavily influenced by the fact that Gunn's financial condition is such that he is unlikely to be able to satisfy the court's order of disgorgement, much less pay whatever penalty is imposed.  Accord *Securities and Exchange Commission v. Soroosh*, 166 F3.d 343 (tbl.), 1998 WL 904696, at *2 (9th Cir. Dec. 24, 1998) (mem. op.) (affirming the district court's decision to assess a $160,000 penalty against a defendant whose insider trading had netted him more than $500,000 in profit on the ground that the $160,000 fine "was the approximate balance left in [the defendant]'s brokerage accounts after payment of disgorgement, prejudgment interest, and expert witness expenses"); *Yun*, 148 F. Supp. 2d at 1297-98 (assessing a penalty of $100,000 on a defendant whose net worth was less than the $269,000 the court had ordered him to disgorge).  In light of the facts and circumstances of this case and

based on its consideration of the factors enumerated above, the court assesses a civil penalty against Gunn in the amount of $50,000.

### III. CONCLUSION

For the reasons discussed above, the SEC's motion for entry of judgment on the verdict is **GRANTED**. The court will enter judgment in favor of the Commission by separate document in accordance with Federal Rule of Civil Procedure 58(a).

The court will issue separately an order of permanent injunction that comports with the rulings made in this memorandum opinion and order.

Counsel for the SEC shall submit, within ten days of this date, proposed forms of judgment and permanent injunction in conformity with this memorandum opinion and order.

**SO ORDERED**.

August 25, 2010.

_A. Joe Fish_
_____
**A. JOE FISH**
**Senior United States District Judge**

# EXHIBIT A

# Court's Calcluation of Prejudgment Interest

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Total |
|---|---|---|---|---|
| (Principal plus interest as of 09/30/2009) | | | | $134,836.57 |
| 10/01/2009 - 12/31/2009 | 4% | 1% | $1,348.37 | $136,184.94 |
| 01/01/2010 - 03/31/2010 | 4% | 1% | $1,361.85 | $137,546.79 |
| 04/01/2010 - 06/30/2010 | 4% | 1% | $1,375.47 | $138,922.25 |
| 07/01/2010 - 08/26/2010 | 4% | 0.62% | $860.71 | **$139,782.97** |
| **Quarter Interest Sum** | | | **$4,946.40** | |
| **Interest as of 09/30/2009** | | | **$26,248.70** | |
| **Total Interest** | | | **$31,195.10** | |

\*      The period rate for the third quarter of 2010 (07/01/2010-09/30/2010) is 1%. August 26, 2010, is the fifth-seventh day of the third quarter. The quarter has 92 days. The court prorated the quarterly interest rate and therefore applied an interest rate of 0.619565% for the period.